# United States District Court
## District of New Jersey

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL COMPLAINT |
| | : | |
| v. | : | **Magistrate No. 05-1052** |
| | : | |
| **GABRIEL CARAFA** | : | |

I, Patrick Henning, being duly sworn, state that the following is true and correct to the best of my knowledge and belief. On or about

SEE ATTACHMENT A

I further state that I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, and that this complaint is based on the following facts:

SEE ATTACHMENT B

_____
PATRICK HENNING, SPECIAL AGENT
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES

Sworn to before me and subscribed in my presence,

May 20, 2005
Date

at Camden, New Jersey
City and State

HONORABLE ANN MARIE DONIO
United States Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

CONTENTS APPROVED
U. S. ATTORNEY

By: _____

A.U.S.A. HOWARD WIENER

Date: ___5/20/05___

ATTACHMENT A

## COUNT 1

On or about April 25, 2005, at Pennsville, in the District of New Jersey, and elsewhere, the defendant

GABRIEL CARAFA,

having been convicted of a crime punishable by imprisonment for a term exceeding one year on or about November 30, 2001, in the Ocean County (New Jersey) Superior Court, did knowingly possess in and affecting commerce a .22 caliber Winchester rifle with an obliterated serial number.

In violation of Title 18, United States Code, Sections 922(g)(1) and 2.

COUNT 2

On or about May 14, 2005, at Pennsville, in the District of New Jersey, and elsewhere, the defendant

GABRIEL CARAFA,

having been convicted of a crime punishable by imprisonment for a term exceeding one year on or about November 30, 2001, in the Ocean County (New Jersey) Superior Court, did knowingly possess in and affecting commerce the following firearms:

1.  .22 caliber rifle, Remington, Model 550-1;

2.  .32 caliber JP Sauer & Sohn revolver, serial number 316901;

3.  12 gauge shotgun, Marlin, Model 55, bolt action;

4.  12 gauge shotgun, Browning, serial number OV27081;

5.  .35 caliber rifle, Marlin, Model 336, serial number T1114;

6.  12 gauge shotgun, Springfield, Model 67H, serial number A025138;

7.  20 gauge shotgun, Winchester, Ranger Model 120, serial number L1754524;

8.  12 gauge shotgun, Browning, Model Light 12, serial number 47292;

9.  .30-06 caliber rifle, Remington, Model Gamemaster 760, serial number 462289;

10. double barrel shotgun, A. Francotte, serial number 32061; and

11. 12 gauge shotgun, Stevens, Model 311, serial number 5100;

In violation of Title 18, United States Code, Sections 922(g)(1) and 2.

ATTACHMENT B

Investigation by the Affiant has revealed the following:

1.   I am a Special Agent for the Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been assigned to the Philadelphia Division Office for approximately three years.

2.   In or about January 2005, a confidential informant ("the CI") provided information concerning an individual named Gabriel Carafa.  The CI stated in substance that Carafa, a person he previously knew, asked whether the CI could build him a bomb if Carafa provided the component materials.  The CI subsequently advised law enforcement authorities of this conversation.  From that point onward, the CI was directed to advise the authorities when and if he would be meeting with Carafa again.  Virtually all subsequent contacts with Carafa-whether they were telephonic or in person-were recorded by the CI utilizing law enforcement recording equipment.  While I did not review any of the recordings, I did speak with a law enforcement officer who did, and he related to me the substance of the specific recordings set forth herein.

3.   I have spoken to state law enforcement officers about the CI.  I have been advised that following the arrest of the CI approximately two years ago, which led to a conviction on a third degree crime in New Jersey for providing false information on state firearms application, for which the CI received a probationary sentence, the CI began cooperating with these

1

officers.  The CI's information has led to the arrest and conviction of at least one other person, and has helped law enforcement to locate and arrest at least two fugitives.  To date, the information the CI has provided to law enforcement has been reliable.

4.   During a telephone call between the CI and Carafa on or about April 21, 2005, Carafa mentioned that he had a firearm, a .22 caliber rifle, available to sell to the CI.  The CI expressed an interest in purchasing this firearm, and they agreed on a price of $100.  Carafa offered to grind off the serial number of the firearm.

5.   At a meeting that occurred on or about April 25, 2005, in Pennsville, New Jersey, which followed the aforementioned telephone conversation, the CI met with Carafa and another man later identified as Craig Orler.  Prior to the meeting, the CI's person and the CI's vehicle were searched (to ensure that he had no money, firearms, or contraband on him or available to him) and he was given $300 in marked U.S. currency in order to purchase the aforementioned firearm.  I and other law enforcement officers conducted surveillance of this meeting.  The CI met with Carafa and Orler, and Carafa sold the rifle to the CI for $100.  Carafa also gave over 60 pounds of urea to the CI, which is a precursor to an explosive material that could be used in a bomb.  Carafa boasted that this urea was more pure than the stuff that McVeigh used.  Carafa mentioned that he would acquire various chemicals—and he named them—and give them to the CI for the

2

construction of a bomb. After the meeting, law enforcement officers met with the CI, who was in the CI's vehicle, at which time the CI produced the urea and a rifle, specifically, a lever action .22 caliber Winchester rifle, with an obliterated serial number, which he said he had purchased from Carafa.

6.    On or about May 13, 2005, Carafa called the CI and left a message stating in substance that he had 10 more things that the CI would like. When the CI called Carafa back, they had a conversation during which Carafa confirmed that he had guns for the CI and described the guns in some detail. A review of the recording of this conversation also revealed that Carafa said that "he," referring to Orler, had to get rid of the guns quickly. Thereafter, a number of telephone conversations between the CI and Carafa occurred on the same date. In particular, during one conversation, the substance of which is as follows, Carafa told the CI that he had 12 guns, consisting of two handguns and 10 rifles and shotguns. Carafa advised that Orler would sell the rifles and shotguns to the CI for $1,100, but that they (Carafa and Orler) would each keep a handgun for themselves. Carafa advised that Orler needed the money, and that since other people wanted to buy the guns, the CI needed to act quickly if the CI wanted to buy the guns. The CI advised after one of the telephone conversations on that day that he understood from that conversation that the guns had been stolen. In a subsequent telephone conversation, Carafa advised the CI that he had spoken to Orler, and that Orler would accept $500 as a down or first

3

payment for one pistol and the 10 rifles and shotguns.  The CI
asked if he could buy both handguns, but Carafa responded that he
wanted to keep one for himself, specifically, a .32 caliber
pistol from Orler.

7.   At a meeting in Pennsville, New Jersey that occurred
the next day, on or about May 14, 2005, which followed the
aforementioned telephone conversations, the CI met with Carafa
and Orler.  Prior to the meeting, and as before, the CI's person
and vehicle were searched (to ensure that he had no money,
firearms, or contraband on him or available to him) and he was
given $650 in marked U.S. currency in order to purchase the
aforementioned handgun, rifles, and shotguns.  I and other law
enforcement officers conducted surveillance of this meeting.
During this meeting, the CI initially met with Carafa, who
collected $500 from the CI for the ten rifles and shotguns.  Also
during the meeting, the CI asked Carafa if he would sell him the
aforementioned .32 caliber pistol.  Carafa agreed and the CI
bought that pistol for $150.  At one point, Carafa asked if the
CI wanted to buy an M-16 rifle.  After the CI expressed an
interest in it, Carafa called Orler, and Orler arrived about five
minutes later.  From that point on, Orler actively participated
in the meeting.  One of the things that happened thereafter was
that Carafa physically handed to Orler the $500 that the CI
previously had given to Carafa for the firearms.  According to
the CI, Carafa told Orler the $500 was for the sale of the
firearms.  Orler advised the CI that if the CI wanted the M-16,

4

he would get it for him, along with another rifle and hand
grenades.  The CI learned during the meeting that Carafa and
Orler actually had three handguns, not just the two that Carafa
previously had referred to.  As a result, and based on
instructions law enforcement officers had given to the CI in an
attempt to obtain all firearms believed to be in the possession
of Carafa and Orler, the CI then offered to buy that third
handgun.  Orler responded that he did not have that gun at that
time, but would bring it with him when they met next so that the
CI could pay Orler the remainder of the money due on the purchase
of the rifles and shotguns.  Orler further identified the handgun
as a .22 caliber handgun and stated that he currently had it in
his possession.  They agreed to meet next on or about May 20,
2005.  After this meeting, the CI was debriefed by law
enforcement officers and advised in substance and in part that he
understood from the conversations during this meeting that Orler
recently had stolen the handguns, rifles and shotguns from a
house in Pennsville.  The CI also advised that during that
meeting, Orler had described the .22 caliber handgun and another
.25 caliber handgun.  Shortly thereafter, the Pennsville police
advised that there had been a recent burglary of a residence in
which handguns, rifles, and shotguns were stolen.  The police
provided a report of this burglary, which contained a description
of the stolen firearms.  A review of that report showed that the
description of the stolen firearms matched to a large extent the
handgun, rifles, and shotguns sold to the CI on that date; the

report also listed a .25 caliber handgun.

8.   I obtained criminal histories of both Carafa and Orler and examined them.  I learned that Carafa was convicted on or about November 30, 2001 in the Ocean County (NJ) Superior Court, of manufacturing or distributing drugs, a third degree crime in New Jersey, which subjected him to imprisonment for a term exceeding one year.  Later, on or about April 29, 2004, Carafa was convicted of bias intimidation, a second degree crime in New Jersey, and received a state prison sentence of three years.  On that same date, his probation was revoked for the first conviction, and he was given a state prison sentence concurrent to the sentence for the second conviction.

9.   I learned that Orler not only has a prior felony conviction, but also has at least three "violent felony" convictions within the meaning of 18 U.S.C. § 924(e). Specifically, on or about September 25, 1996, Orler was convicted of aggravated assault with a deadly weapon in the Ocean County (NJ) Superior Court, committed on or about October 1, 1995, a violation of New Jersey Statutes Section 2C:12-1(b)(2), and received a five year state prison sentence.  On or about April 24, 1998, Orler was convicted of burglary of a structure, in the Ocean County (NJ) Superior Court, committed on or about July 25, 1997, a violation of New Jersey Statutes Section 2C:18-2(a)(1), and received a five year state prison sentence.  On or about April 24, 1998, Orler was convicted of burglary of a structure, in the Ocean County (NJ) Superior Court, committed on or about

6

November 5, 1997, a violation of New Jersey Statutes Section 2C:18-2(a)(1), and received a five year state prison sentence.

10.   The aforementioned firearms-the handgun and the ten rifles and shotguns-are described as follows: (1) .22 caliber rifle, Remington, Model 550-1; (2) .32 caliber JP Sauer & Sohn revolver, serial number 316901; (3) 12 gauge shotgun, Marlin, Model 55, bolt action; (4) 12 gauge shotgun, Browning, serial number OV27081; (5) .35 caliber rifle, Marlin, Model 336, serial number T1114; (6) 12 gauge shotgun, Springfield, Model 67H, serial number A025138; (7) 20 gauge shotgun, Winchester, Ranger Model 120, serial number L1754524; (8) 12 gauge shotgun, Browning, Model Light 12, serial number 47292; (9) .30-06 caliber rifle, Remington, Model Gamemaster 760, serial number 462289; (10) double barrel shotgun, A. Francotte, serial number 32061; and (11) 12 gauge shotgun, Stevens, Model 311, serial number 5100.

11.   The aforementioned 11 firearms set forth and described in paragraph 10 above all moved in interstate or foreign commerce.   I know this because I described the firearms to an ATF special agent who has received specialized training in the manufacturing of firearms, specifically, where various firearms are manufactured and which companies manufacture firearms.   He advised me in substance that none of the 11 firearms were manufactured in New Jersey, which means that all of them were transported or moved across state lines, or were imported into the United States, or both.